Judge of the United States Court of Appeals to the Second Circuit, hear ye, hear ye, hear ye. All persons having business before this, standing apart from the United States Court of Appeals to the Second Circuit, draw near, give your attention, and use up your courage. God save the United States of America and his Honorable Court. Please be seated. Good morning, everyone. We have five argued cases on the calendar this morning, and one submitted case. The submitted case is Vlad Bereniden v. New York City Metropolitan Transportation, and we will take that on submission. Five argued cases, a rather long calendar, so we're going to be watching the light a little bit today. I've been told that counsel is present in all cases except for the second case, and we are missing one lawyer, so we're going to move that case to the end of the calendar. That's Sotamba v. Barr. And I otherwise will dispense with reading the schedule this morning, and we're ready to start with the first case. That's Water Pollution Control v. FlowServe U.S. Good morning, Your Honors. My name is Martha Gaithwaite, and I represent the Water Pollution Control Authority of the City of Norwalk, Connecticut. The court committed an abuse of discretion and manifest error when it excluded our experts in this case. The court then compounded that error by granting summary judgment largely because we had no experts. The experts should not have been excluded. Judy Hodgson, the WPCA's principal expert, is a professional engineer. She is not a professional witness. She approached her assignment in this case with the same methodology and scientific rigor that she approaches her engineering work with. She is the only expert in this case who performed a physical forensic examination of the pump seals in question, and she explained that based on that forensic examination, the seals could not have been run dry. She is such a scientist that she insisted on coming to the depositions in person so that she would have an opportunity to ask me to ask additional technical questions. She wrote . . . One of the things that the district court pointed to was obviously operation error was a key issue, and the district court pointed out to the failure to look at the daily log books and the other materials related to that issue. What's your response to that? That's a manifestly erroneous conclusion by the district court. To put this in context, Your Honor, the system in Norwalk is monitored by a computer software program that is called SCADA. The computer printout is SCADA data, and Ms. Hodgson testified that she had reviewed years of the SCADA data for each individual pump. She then analyzed that. In fact, in her report, she ends up with a figure, I think it's figure 18, where she analyzes the data, the actual operating data, on the day of the catastrophic failure in August. You mentioned that data in your opposition to the Daubert motion. I thought I saw that that wasn't even something that was pointed to, to the district court in your opposition. Your Honor, in terms of the SCADA data, it is throughout her report, it is throughout her transcript that the court said that the court had read. It is pervasive in the report. It is pervasive in her deposition testimony. She said on page 650 of the appendix that one look at the SCADA data told her that the theory that the pumps ran dry just could not be true. To put this in context, the operators at OMI sit in front of a computer screen in an office that is five stories above the pumps. They are looking at the SCADA data that comes across their screen. They then make notes about what they believe that SCADA data shows. To put this- You're saying that the information in the OMI logs is essentially derived from the SCADA data? The 16 pages, and actually there are only four pages that actually talk about the pumps, but those pages are random notes taken by operators, not pump experts, who are looking on the screen at the SCADA data. Judy Hodgson is a pump expert. She's not an operator. Judy Hodgson is the expert that they brought in after the Fukushima nuclear power plant failure to have her design seals so that there would not be another disaster like that in the future. My impression is that her testimony was excluded largely because what she was testifying to was survey results and characterized what she was offering as survey results, and that it seems pretty clear that whatever inquiry she made does not fit the requisite procedures for a survey. Your Honor, we have no objection to the court deciding to exclude the survey information, but Ms. Hodgson was perfectly clear both in her deposition and in an affidavit submitted in opposition to the motion to exclude that she had not relied on the survey data. That's at the appendix 230. So there was no basis for saying that she relied on it. She relied on her knowledge. She relied on the forensic examinations. She relied on the—she has a 106-page report. The issue is, did she rely for all of the issues on which her testimony was offered on the inquiries that she made among other purchasers of this product? No. As she explained in her deposition, Your Honor, she only made the survey inquiries because Flosser had taken the position that it must be your fault, Norwalk, because we never had a problem. We never had a problem. But you could—she has said in her affidavit and in her deposition that's why she used it. She didn't form any opinions based on it. You can exclude the survey data. It does not affect her opinions one way or the other. But to get back to the Court's question about the logs, I mean, the fact that this woman with this background read the actual SCADA data, analyzed it— The logs were available and would be available at a trial to be introduced in evidence, I take it. I'm not sure that these particular logs would be, Your Honor. I don't know that they satisfy the business records exception. We have people who are operators, unidentified operators. In some one page, it's a post-it note that they say that she should have read and relied on. So I don't know that it would meet the business records exception, and that's why we objected to that proposed use of that evidence in opposition to the motion for summary judgment. So it is similar to saying that—I see I'm running out of time, but—so we don't think she should have been excluded. There was no basis for excluding it. She provided all of her calculations. She provided thousands of pages to Floor Service Counsel. But even if we don't have an expert, we still have a right to a jury trial on the unfair trade practices claim. That records— Let me just ask you to address Dixon's testimony as well for a few moments. I mean, the exclusion of that testimony. As I look at the record, it doesn't—he testified he didn't review some of the invoices related to the repair of a couple of the pumps and the OMI operation and maintenance contract. I mean, did he—how is it an abuse of discretion to exclude his testimony, given what he reviewed and didn't review? He has very limited testimony, Your Honor, and vigorous cross-examination could expose any failures in his opinions. But basically he said you have a license, you have to protect the environment, you have to make sure that you have reliable pumps. They spent close to $4 million on replacing the pumps. I think that that was a reasonable thing to do, given the fact that if these pumps fail, sewage backs up in people's homes, into the streets, and into the waterways. It was too serious a risk for the city not to do that. One of the characteristics or one of the defects that your expert found in this product was that the installation guide did not advise, as competing products did, that a venting system should be installed. So wouldn't it have been—wouldn't it have reduced damages to install a venting system rather than rip out and throw out the whole thing? Except that, Your Honor, because of the undersized motors, because of the problems with the way the shafts were undersized, with the problems of the coolant system, with the problems of the sensor system, you basically are doing a Band-Aid approach, and you're going to have a catastrophic disaster if you— the venting would not prevent all of the wholesale problems that she detailed in her report. It would just stop a problem momentarily. We also believe that the—we are entitled to a jury trial with respect to the unfair and deceptive trade practices. We believe that the facts support that it is not preempted by the Connecticut Product Liability Act. As the Supreme Court of Connecticut said in the Garrity decision, they are not intending by passing the Connecticut Product Liability Law to preempt the Unfair Trade Practices Act. In addition, the Garrity court explained that just because a claim under the Unfair Trade Practices Act is based in part on the sale of a product, it does not mean that it's preempted. Your expert, Mr. Dixon, is the one who offered testimony concerning damages. If his testimony was properly excluded on Daubert grounds, would you, on summary judgment, have been left with no damages testimony? In which case, you have a problem with a contract claim. No, Your Honor, because we actually have the invoices. We actually spent the money. This isn't some hypothetical economist saying this might cost us this in the future. We have the actual invoices of what we spent for analysis, for reconfiguration, for replacing it with the flight pumps that are working perfectly fine without any problems at the City of Norwalk. We would have that factual evidence to be able to present to the jury at the time of trial. Thank you, Your Honor. Thank you, Your Honor. Thank you. Good morning, and may it please the Court. My name is Jason Eckerly, representing FlowServe U.S. Inc. I'll go back to address some of the issues that were raised with counsel for the WPCA in the order in which they were raised. In terms of the SCADA data that was brought up, the SCADA data measures the flow, the flow through the plant. That was not included in the underlying briefing in the district court. It was not mentioned. It should not be included in what's considered here. Further, the operators are actually by the pumps. If there are issues, they can see things that the computers cannot. That's what's recorded in the OMI records. That's why the OMI records are important. In terms of the OMI records, they were not brought up in the lower court in terms of Ms. Hodgson. They're brought up in this court for the first time in terms of an objection. There is argued that they were objected to in the summary judgment motion. That may be true, but the summary judgment motion has no impact on the Daubert motion. They were objected to in the Rule 56 statement. The local rules say that objections or admissions or denials are only relevant to the summary judgment motion. So an objection in the local Rule 56 statement would not carry over to a Daubert motion. The 2010 amendments. I understand your waiver arguments, and they're very ably briefed. But could you just address the argument that there was not a need to look at the OMI records because the SCADA data was enough and elaborate a little bit more? I understand the point. They're there. They can go down and examine. The computer is just measuring one variable. But what was so important about looking at this particular data and arriving at the expert's opinion? Sure. Ms. Hodgson has the opinion that there was not operator error. How you get to the opinion there was not operator error without looking at what the operators were saying and doing is the problem. That's what these logs reflect, and that's why they're important. For her to have that opinion without looking at those goes to the reliability of her opinions and supports the district court's position that they should not be included. What about the fact that there was no hearing? I know for Dixon they didn't request a hearing. Sure. What about the fact that the district court didn't have a hearing before excluding Ms. Hodgson's testimony? I would rely upon the Cologne case for that. The case law has settled that it's in the district court's discretion whether or not to have that hearing. Here we had a very well-developed factual record. Ms. Hodgson was deposed for the full time limit allowed by the federal rules of seven hours. She did issue her 100-plus page report. She issued a rebuttal report. We had all the underlying documentation that went with all of that. So there was no need for the court to have had a hearing on that. The record was sufficient. In terms of the damages issue that was brought up, the issue there is that the invoices were not part of the record on summary judgment. The only evidence relating to damages in the district court was from a self-serving affidavit signed by the WPCA. So there is that lack of damages . . . That's usually what affidavits are. Agreed. Otherwise they don't get submitted, I'm sure. Yes, but I think that goes to the sham affidavit. That wasn't submitted until following the briefing. There is the better evidence of the actual invoices that could have been submitted but was not. Let me ask you this. A good part of Ms. Hodgson's testimony was excluded because she characterized some of what she did as a survey. It was self-characterized. If you excise from her testimony the opinions that were based upon the activity she described as a survey, it seems to me quite a lot would be left. I mean, she identified eight design and manufacturing defects. One of them was based on a survey, but the other eight don't seem to have been. Were they? I believe it was more than one that was included as a result of the survey. Further, the survey is so intertwined in what she's done below. If you look at her deposition transcript, she says the word survey more than 50 times. If you look at the 100-plus page report that she issues, it's woven in throughout. It's not just one individual section, and it may not say the word survey, but she may go and say a review of user guides or a review of this that comes back to the survey. Your adversary argues that what she characterized as a survey and what probably could be characterized as a survey was admissible to rebut your client's position that they never heard of this problem and that there's nothing wrong with it, and to indicate that, in fact, it's a problem that has appeared elsewhere. And if Ms. Hodgson had done the survey in a scientific way, then that would be a different conversation. Why do you have to do it in a scientific way? Call an airline and say, my seat was too small. They'll always say, well, we never heard of that before. And that seems to be the kind of thing here. You say, we never heard of a problem with these pumps, so somebody makes a bunch of phone calls, talks to your customers, and finds seven or eight of them have the same problem. That refutes, that would refute your client's litigation position that you don't have any problem, you haven't heard any complaints. The problem that she has with the survey is, one, it was taken under false pretenses. She lied when she called and said she was looking to purchase pumps. Two, FlowServe manufactures a variety of pumps. The pumps that we're talking about in this treatment facility are the largest. She could be calling on a different type of pump. There was nothing to indicate that these pumps are similar. And so that's why it lacks the repeatability. We can't go back and say,  Oh, this is right or this is wrong because she did X. There's a smattering of handwritten notes that are absolutely unintelligible in what she records relative to her survey. And so there's no way for us to examine that or explore it or even for me to cross-examine her when I was able to depose her because it's just nonsensical. And that's the problem, and that goes to the reliability factors. All right. Thank you. May it please the Court, Your Honors. My name is Jared Cohane. I represent Gilbane Building Company. At the outset, whether or not the Court reverses and remands with respect to FlowServe, and I believe Mr. Eccles' briefs are outstanding and well-argued and I believe it should be affirmed, it doesn't matter with respect to Gilbane. The one count against my client by the WPCA relates to breach of fiduciary duty, and the district court's ruling was correct. There is no evidence in the record of any self-dealing whatsoever. And even if there were, in terms of the fact that . . . I would rely on ratification. Yes, sir. Yes, Your Honor. The ratification by the WPCA of the application to the Clean Water Fund, which contains the terms and conditions, the very terms and conditions that Gilbane ultimately entered into when it entered the purchase order as the project got underway. On that issue, though, Counsel, two things. Yes, Your Honor. They point to the fact that there were e-mails and ongoing negotiations about that term, the orientation liability provision, into 2010, well after the application was submitted to the Clean Water Fund, right? There are, Your Honor, and I would submit . . . Why wouldn't there be an issue of fact on that? If there's ongoing e-mails negotiating this term, even if it was submitted to the Clean Water Act, doesn't that create an issue of fact? I don't believe so, Your Honor. For the mere fact that by certifying the application, Gilbane's hands are tied to those terms and conditions. It can try in doing its fiduciary duty . . . The Clean Water Fund application doesn't . . . They're not looking at the limitation of liability issue, right? That's not one of their purposes, is it? No, Your Honor. The whole package is submitted to secure funding, which includes all of the various bid packages, the terms and conditions that FlowServe had when it submitted its bid package, are all put in and certified by the WPCA to secure the funding so that the project can go forward. So, at that point, Your Honor, Gilbane's hands are tied to FlowServe. It can't change that absent some other change in the contract or directed from the WPCA. In terms of negotiating and continuing to negotiate and trying to get the best deal it could for the WPCA and further its interest, that's evidence of Gilbane fulfilling its fiduciary obligation. At the end of the day, they got exactly what was in the application for the clean water funding. So, I don't believe there's an issue of fact there. If I may, Your Honor, in terms of whether there's any evidence whatsoever of self-dealing by Gilbane, the WPCA raises two issues. The first is this issue of the censors. And I call the Court's attention to Exhibit 21 of FlowServe's 56A1 statement, which is relied upon by the WPCA. It's at Joint Appendix 1858. That's the document that they cite that somehow Gilbane essentially horse-treated the warranty terms and conditions to secure the censors. If the Court were to look at Exhibit 21, it's quite clear that the omission was not Gilbane's. It was WPCA's design team. That's why the censors were added later. That's an error that falls within the column of the WPCA. It's not Gilbane's responsibility. And I think that evidence is clear. So you cannot infer that there was self-dealing or horse-treating going on to secure the procurement of the censors. The second inference the WPCA asked the District Court and here above to assume is that Gilbane was under the gun to avoid delaying the project. There is no evidence in the record. Nothing. Not an e-mail, not a letter that indicates at any time that the WPCA was threatening damages because the project was falling behind. And even if it were falling behind and there was a change to a different pump provider, there's a provision in the contract that gets Gilbane out of any liability or responsibility for that delay. That would be a design issue. That would be the spearing doctrine I cite in our briefs. It's well settled. It's accepted in Connecticut. And essentially, if there's a design change, it's on the WPCA. We'd be entitled to an extension of time and reasonable compensation. So we're not under the gun. There's not enough evidence to support any issue of material fact as to self-dealing, thereby the fiduciary duty claim fails. Finally, as I'm running out of time, I just want to point out that, again, we believe that FloServe's motion should be affirmed, the court's ruling should be affirmed. But if they're not and it's reversed and remanded, our count should still be affirmed. And even if it is reversed and remanded, there's a second count by FloServe and a limitation of liability back at us. We believe the court's dicta would suddenly, if it is reversed and remanded, become ripe, and Gilbane would be out of the case entirely. Thank you for the honor of arguing before you. Thank you. Briefly, your honors, with respect to where this data is displayed, it is displayed on a computer screen that is in an office five stories above the pumps themselves, and that's at appendix 1537. Sean Jennings, the maintenance manager, testified that the operators do not go downstairs. It's the maintenance people that go downstairs. The 16 pages of handwritten notes talk mainly about people who are out sick. There are four pages that even mention a pump. And I would suggest that this is similar to a situation where if somebody is fluent in Greek, they decide that they want to read the Iliad, they read the Iliad, and then they are told that their translation and understanding of the story is unreliable because they did not also read the cliff notes. These operators are not pump experts. This world-class expert is a pump expert. She analyzed the data, and with respect to what the data shows, it's clear on the appendix at 600 that the SCADA data looks at all of the operating parameters of this pump facility. It shows what the wet well level is. It shows that the wet well did not run dry, and as explained in detail in her deposition, there was water being brought into the facility at all times during the events. With respect to Gilbane, there is a clear factual dispute with respect to whether Gilbane had actual express authority to enter into this limitation of liability language. It did not. There is no record evidence from anyone saying, yes, we got this authority. With respect to the ratification question Your Honor asked, in March of 2010, nine months after the Clean Water Fund Act application was submitted, there was a letter, an email from the folks at Gilbane saying, we don't have authority to do this. You submitted a public bid. You were held to the terms and conditions of the public bid, and we're not going to agree to this. On the document that allegedly the WPCA ratified, the front page of that package says, by submitting a bid, you are agreeing to the terms and conditions of this bid. Those terms and conditions did not include a limitation of liability clause and contain language that was favorable to the WPCA. There was no authority. The fact that there may have been a counterproposal at the back of that package does not constitute a ratification by the WPCA. We have submitted affidavits, undisputed affidavits, that no one from the WPCA provided express authority to anyone at Gilbane in order to execute this limitation of liability clause. They didn't know anything about the limitation of liability clause. Furthermore, Floserve knew, based on the scoping meeting, that Gilbane needed express authority. For all those reasons, Your Honors, we would respectfully request that the decisions of the district court be reversed and that this case be remanded for a trial. Thank you very much. Thank you all. Nicely argued. We'll take it under advisement.